THOMAS A. WILBOURNE v. FRANK D. BALDWIN AND
FRANK FARWELL.

INTERIOR DEPARTMENT—*Judgment and Discretion not to be Interfered with by the Courts.* In the officers of the interior department is vested the judgment and discretion of determining, when applications for public lands are presented, whether the lands applied for are public lands open to settlement, or whether they are Indian lands, or whether, for any other reason, they are not open to settlement; and the determination of this question will not be interfered with by the courts, by injunction, in behalf of a homestead applicant prior to the time the question has gone beyond the control of the interior department by the disposal of the lands and their becoming the subject of private instead of governmental ownership.

*Error from the District Court of Canadian County.*

Action by plaintiff below, for himself and others similarly situated, to restrain Frank D. Baldwin, as Indian agent, and Frank Farwell, as Indian policeman, from removing plaintiff and such other persons from land. Temporary injunction was granted, and on motion of defendants, presented by the United States attorney, the temporary injunction was dissolved. From this order plaintiff Wilbourne appeals. Affirmed.

*Blake & Blake*, for plaintiff in error.

*C. R. Brooks, United States Attorney*, and *T. F. McMechan* and *Roy Hoffman*, for defendants in error.

The opinion of the court was delivered by

BIERER, J.: Plaintiff in error, Thomas A. Wilbourne, brought his action in the district court of Canadian county to enjoin the defendants, Frank B. Baldwin, as Indian agent of the Kiowa and Comanche Indians, and Frank Farwell, as Indian policeman for such Indians,

from removing the plaintiff, and others who, he alleges, were similarly situated, from a tract of land which, it is claimed by him, is a part of the Cheyenne and Arapahoe country, and opened for settlement by proclamation of the president on April 19, 1892. A temporary injunction was by the judge of the district court allowed on the twenty-second day of February, 1895. A motion was made by the United States attorney, on behalf of the defendants, on November 30, 1895, to dissolve this temporary injunction, and presented to the court and taken under advisement. On the first day of May, 1896, this motion was sustained, and the temporary injunction vacated and discharged. From this action the appeal is taken.

There is no law authorizing the plaintiff, in this character of a case, to bring suit for any other person than himself, so the case will be considered as if brought for himself alone.

The contention of the plaintiff is that certain lands which lie north of the Washita river, and in a bend thereof, in township 7 north, and in ranges 14 and 15 west of the Indian Meridian, were a part of the Cheyenne and Arapahoe country, and have been, by the president's proclamation, opened to settlement. That he selected and settled upon 160 acres of this land and made application to enter the same at the land office, which application was rejected, and his right of entry denied.

The defendants in this case are officers of the government, and representing the government in the discharge of its duties to the Kiowa and Comanche Indians, so that in this case it is proper to state the contentions of the defendants as the claims of the government, for these parties, as individuals, have no interest whatever in the matter, but are purely representative in their capacity.

The government contends that the lands in controversy are a part of the Kiowa and Comanche reservation, and no part of the Cheyenne and Arapahoe country.

The history of the case, out of which these contentions have grown, is as follows:

By treaty with the Kiowa and Comanche Indians of October 21, 1867, proclaimed August 25, 1868, (Revision of Indian Treaties, p. 318), a district of country was set apart for the absolute and undisturbed use and occupation of these Indians, the portion of the boundary as it applies to this case being as follows:

"Commencing at a point where the Washita river crosses the 98th meridian west from Greenwich; thence up the Washita river, in the middle of the main channel thereof, to a point thirty miles, by river, west of Fort Cobb, as now established; thence due west to the North Fork of Red river," etc.

By an executive order dated August 10, 1869, (see Executive Orders relating to Indian reservations, issued prior to April 1, 1890, p. 31), the Cheyenne and Arapahoe Indians were assigned to a tract of land set apart for their use and occupancy, the boundary thereof commencing at the initial point of the reservation assigned to the Kiowa and Comanche Indians, the boundary then being extended north and west to the 100th meridian and then completed as follows:

"Thence south on the line of said one hundredth degree to the north boundary of the country set apart for the Kiowas and Commanches by the second article of the treaty concluded October 21, 1867, with said tribes; thence east along said boundary to the point where it strikes the Washita river; thence down said Washita river, in the middle of the main channel thereof, to the place of beginning."

By act of congress of March 3, 1891 (26 Stats. at

Large, 1032; acts of congress, second session fifty-first congress, p. 989), the Cheyenne and Arapahoe Indians ceded all their claim, right, title and interest of every kind and character in and to their reservation, to the United States, the portion of the description of this reservation as pertains to this case, and as contained in this act, being as follows:

"Thence south on the line of the said one hundredth degree to the point where it strikes the North Fork of the Red river; thence down said North Fork of the Red river to a point where it strikes the north line of the Kiowa and Comanche reservation; thence east along said boundary to a point where it strikes the Washita river; thence down said Washita river, in the middle of the main channel thereof, to the place of beginning," etc.

Under, and in pursuance of this latter act of congress the president, on April 12, 1892, (see Statutes of the United States, first session fifty-second congress, 1891-1892, list of proclamations of the president contained in said volume, at p. 40 of such proclamations), opened all the lands acquired from the Cheyenne and Arapahoe Indians for homestead settlement, except the lands therein described as claimed by the Wichita and affiliated bands of Indians, or otherwise reserved from settlement, there being attached to the proclamation a schedule of the lands mentioned, in the following language:

"The lands to be so opened to settlement are for greater convenience particularly described in the accompanying schedule, entitled 'Schedule of lands within the Cheyenne and Arapahoe Indian Reservation, Oklahoma Territory, opened to settlement by proclamation of the President.'"

Following that, the proclamation contains this language:

"Each entry shall be in square form as nearly as practicable, and no other lands in the Territory of Oklahoma

are opened to settlement under this proclamation, the agreement with the said Cheyenne and Arapahoe Indians, or the act ratifying the same."

Now it is admitted by the government that under the description contained in the executive order assigning lands to the Cheyenne and Arapahoe Indians, and their cession to the government, and the act of congress and the president's proclamation opening these lands, that the lands in controversy would be within the Cheyenne and Arapahoe country.   But it is claimed by the government that the point on the Washita river, from which the north line of the Kiowa and Comanche reservation extends due west to the North Fork of the Red river, is very near the southwest quarter of section 35, in township 8 north, range 14, west of the Indian Meridian, so that all the lands south of it, and in the bend of the Washita river, adjacent thereto, are in the Kiowa and Comanche reservation; while it is claimed by the plaintiff that this point thirty miles west of Fort Cobb on the Washita river, is further west, so as to, in fact, place all the lands north and east of the point from which the north line of the Kiowa and Comanche reservation extends due west from the Washita river to the North Fork of the Red river, in the Cheyenne and Arapahoe reservation.   It is claimed by the plaintiff, also, that no survey fixing this thirty-mile point has ever been made, so that its location is a disputed question of fact, and must be determined by survey: while it is claimed by the government that the survey has been made, and the point located as before stated.

The plaintiff contends that even though these lands were originally set apart for the Kiowa and Comanche Indians, the subsequent executive order assigning the

Cheyenne and Arapahoe Indians thereto, and the subsequent treaty with these latter Indians, and the act of congress, and the president's proclamation opening these lands for settlement, has had the effect of repealing the treaty with the Kiowa and Comanche Indians, and that the title to these lands is entirely in the United States, and that they are public lands, open to homestead settlement, and not a part of the Kiowa and Comanche reservation, and that the government, through its officers, the defendants in this case, has no authority whatever to remove the plaintiff from these lands, and they should therefore be enjoined.

Able briefs are presented by counsel on both sides of this case, and the question of title is strenuously asserted and opposed in these briefs and presented to us for our determination. To decide this question of title would indeed be a very interesting, as well as exceedingly important task; but we cannot accept the invitation of counsel, ably as it is presented on both sides, to do so, for from our view of the case, this is not the proper time and place for that determination. The title to these lands is yet in the government of the United States, and it is either, under plaintiff's contention, public lands of the United States, or, as he further contends, public lands of the United States open to homestead settlement and entry; or, as claimed by the government, lands of the United States which, by grant and treaty with the Kiowa and Comanche Indians, these Indians have been vested with the use and occupation of. The plaintiff has no title therein. He has not even an entry upon a part of these lands. His settlement has never been recognized by the government.

The conflicting questions concerning these lands are

matters within the province of another branch of the government than that of which we compose a part, and until the title to these lands shall have passed beyond the control of the executive branch of the government, the secretary of the interior, with his various subordinate officers, consisting of the commissioner of the general land office and the officers of the local land offices, is clothed with the power and authority of determining these questions, and with which determination the courts should in no way interfere.

Section 441, R. S. U. S., provides:

"The secretary of the interior is charged with the supervision of public business relating to the following subjects:  *  *  *  Second.   The public lands, including mines."

Section 453 provides:

"The commissioner of the general land office shall perform, under the direction of the secretary of the interior, all executive duties appertaining to the surveying and sale of the public lands of the United States, or in any wise respecting such public lands, and, also, such as relate to private claims of land, and the issuing of patents for all (agents), (grants) of land under the authority of the government."

The question as to the status of these lands came before the secretary of the interior and was decided by him in the case of *J. M. Johnson*, (reported in 15 Land Decisions, 87), on the 21st day of July, 1892, where he held that this tract of land was within the tract reserved and set apart by treaty to the Kiowa and Comanche Indians, under treaty proclaimed August 25, 1868; and that it could not legally be included within the tract of land reserved by the executive order assigning lands to the Cheyenne and Arapahoe Indians.   He also held, in construing the proclamation of the president, of April

12, 1892, opening the Cheyenne and Arapahoe Indian lands to settlement, that as these lands in controversy were not particularly described in the schedule attached to the president's proclamation, they were not opened to settlement thereby; and also decided that they were not opened by operation of law, because there had been no law excepting that on which the president had acted in the issuance of his proclamation opening the lands to settlement. This determination was concluded in the following language:

"Therefore, in reply to your request to be advised as to the status of these lands, I would say that, waiving the question as to whether, or not, they actually remain a portion of the reservation set aside by treaty with the Kiowa and Comanche Indians, it must be held that none of the lands in question which are situated south of the line of the north boundary of said reservation, as indicated on the official plats of survey, and as recognized by the land department, are subject to settlement or entry, but said lands will be considered, by this department, as reserved for the use of the Kiowa and Comanche Indians, until such time as congress shall take action in the premises."

Now this was a judicial determination by that branch of the government, the secretary of the interior, charged with the disposal of public lands, and until these lands have passed from the government and have become the subject of private ownership, this court has no right or authority whatever to disturb this determination by an injunctional proceeding, or, in fact, by any other. This conclusion has many times been reached by the decisions of the federal courts, and particularly by those of the United States supreme court, and is not opposed by a single judicial determination, at least not so far as we have been able to find, or has been cited by counsel.

In the case of *Sioux City & St. P. R. Co. v. United States*, 34 Fed. Rep. 835, the railroad sought to enjoin the local land officers and the commissioner of the general land office from allowing proof to be made and acted upon for the completion of entries upon land which the railroad company had selected as its indemnity lands, and which it alleged it was the owner of under an act of congress granting it certain lands. In its determination of the case the court said :

"The ultimate question presented for determination by the averments of the bill is whether the lands in question passed, under the act of congress and of the general assembly of Iowa, to the complainant, or whether they still remain part of the unappropriated lands of the United States, and therefore open to entry by preemption and homesteaders. This is a question which requires for its determination the examination and construction of the act of congress, of the acts of the general assembly of the state of Iowa touching these lands, and of the acts done, and work of construction performed by complainant, and the examination of the question calls for the exercise of judicial power on part of the officers of the land department. Unless the act of congress of March 3, 1887, confers the right upon the court to control in advance and direct the action of the land department, when called upon to act judicially, it is well settled that the power to do so, either by *mandamus* or injunction, does not exist."

Numerous decisions of the United States supreme court are then cited in support of this conclusion; and the court then proceeds to determine that the act of March 3, 1887, did not extend the jurisdiction of the courts in respect to cases involving the rights of parties to public lands, where the title still remained in the government.

In the case of *Gaines v. Thompson*, 7 Wall. 347, the

18--v.

plaintiff sought to enjoin the secretary of the interior and the commissioner of the general land office from cancelling plaintiff's entry on a tract of land. The court held that the act of the officers in cancelling the entry was one calling for the exercise of judgment and discretion, and could not be controlled by the courts. In the opinion, Mr. Justice Miller quoted this language of Chief Justice Taney, in the case of *Decatur v. Paulding*, 14 Peters, 497:

" 'In general, such duties, whether imposed by act of congress or by resolution, are not mere ministerial duties. The head of an executive department of the government, in the administration of the various and important concerns of his office, is continually required to exercise judgment and discretion. He must exercise his judgment in expounding the laws and resolutions of congress under which he is required to act.' 'If,' he says, 'a suit should come before this court, which involved the construction of any of those laws, the court certainly would not be bound to adopt the construction given by the head of the department. And, if they supposed his decision to be wrong, they would, of course, so pronounce their judgment. But this judgment, upon the construction of the law, must be given in a case in which they have jurisdiction, and in which it is their duty to interpret the acts of congress, in order to ascertain the rights of the parties before them. The court could not entertain an appeal from the decision of one of the secretaries, nor revise his judgment in any case where the law authorized him to exercise judgment or discretion. Nor can it by *mandamus* act directly upon the officer, and guide and control his judgment or discretion in the matters committed to his care, in the ordinary exercise of his official duties.   *   *   *   The interference of the courts with the performance of the ordinary duties of the executive departments would be productive of nothing but mischief, and we are quite satisfied that such a power was never intended to be given to them.' "

The case in which Chief Justice Taney used this language, as stated by Mr. Justice Miller in *Gaines v. Thompson*, was as follows:

"The case of Mrs. Decatur arose under an act of congress, and also a joint resolution of that body of the same date, both providing compensation for the services of her deceased husband; but the measure of this compensation (which was to be paid to her by the secretary of the navy) was in the act different from what it was in the resolution. The secretary held that but one of these was intended by congress, and gave her the. election. She brought suit to compel him to give her both. It is clear she had no other legal remedy. The United States could not be sued. The secretary could not be sued in any other form of action than *mandamus*. But on the ground that the action of the secretary involved the exercise of judgment and discretion, the order of the circuit court refusing the writ was sustained."

Further on in this important case of *Gaines v. Thompson*, Mr. Justice Miller, in speaking of the power conferred upon the secretary of the interior and the commissioner of the general land office in the administration of laws relating to the public lands, said:

"Certain powers and duties are confided to those officers, and to them alone, and however the courts may, in ascertaining the rights of parties in suits properly before them, pass upon the legality of their acts, after the matter has once passed beyond their control, there exists no power in the courts, by any of its processes, to act upon the officer so as to interfere with the exercise of that judgment while the matter is properly before him for action. The reason for this is, that the law reposes this discretion in him for that occasion, and not in the courts. The doctrine, therefore, is as applicable to the writ of injunction as it is to the writ of *mandamus*."

The doctrine announced in *Gaines v. Thompson* has

been followed by the supreme court of the United States ever since, and its force and effect never lessened by a single utterance.

In *Litchfield v. Register and Receiver*, 9 Wall. 575, the plaintiff brought his action in injunction to restrain the defendants, as officers of the local land office, from entertaining and acting upon applications to prove preemptions upon certain lands, which, the plaintiff claimed, by virtue of certain acts of congress, had become his property. The right to enjoin these officers was again denied, Mr. Justice Miller using this forcible and direct language:

"The very first duty which the register is called on to perform, when an application is made to him to enter a tract of land, is to ascertain whether it is subject to entry. This depends upon a variety of circumstances. Has there been a proclamation offering it for sale? Has it been reserved by any act of congress, or of the proper department? Has it been granted by any act of congress, or has it been sold already? These are all questions for him to decide, and they require the exercise of judgment and discretion. The bill shows on it face that these officers, in the exercise of this duty, were considering whether the reservations of the departments and the acts of congress, and the claim of the plaintiff under them, took these lands out of the category of lands subject to sale and preemption, and he asks the court to interfere by injunction to prevent them from determining that question, and that the court shall determine it for them. He says the court below erred because it did not require them to come in and answer to his claim of title, and at their own expense to put the court in possession of their views, and defend their instructions from the commissioner, and convert the contest before the land department into one before the court. This is precisely what this court has decided that no court shall do. After the land officers shall have disposed of the question, if

any legal right of the plaintiff has been invaded, he may seek redress in the courts."

This language, we think, is particularly applicable to the case at bar, and all the questions asked by the supreme court in that case might be asked in this; and if we attempted to determine them, and that determination should be in favor of the plaintiff, our decision would be squarely opposed to that of the secretary of the interior, who still retains, and has in no way lost, jurisdiction of the subject. The question will remain one before that department until some further action is taken by its officers, upon its own motion, or on the application of some person interested, or in pursuance to some further act of congress, which the secretary, we think not inappropriately, holds to be necessary. Such a determination, too, would place us in the attitude of enjoining and prohibiting this defendant Indian agent from the enforcement of a law which the secretary of the interior has called upon him, who is a subordinate of his department, under his supervisory jurisdiction, to enforce. This will be seen by an examination of another portion of the statutes.

Sections 2147, 2148 and 2149, R. S. U. S., provide:

"SEC. 2147. The superintendent of Indian affairs, and the Indian agents and sub-agents, shall have authority to remove from the Indian country all persons found therein contrary to law; and the president is authorized to direct the military force to be employed in such removal.

"SEC. 2148. If any person who has been removed from the Indian country shall thereafter at any time return or be found within the Indian country, he shall be liable to a penalty of one thousand dollars.

"SEC. 2149. The commissioner of Indian affairs is authorized and required, with the approval of the secretary

of the interior, to remove from any tribal reservation any person being therein without authority of law, or whose presence within the limits of the reservation may, in the judgment of the commissioner, be detrimental to the peace and welfare of the Indians, and may employ for the purpose such force as may be necessary to enable the agent to effect the removal of such person."

On October 31, 1894, the department of the interior, under the authority of § 2149, directed a communication to Special Agent Able, the predecessor of the defendant, Baldwin, in office, and who was then in charge of the Kiowa and Comanche agency, which contained the following:

"You will observe that under the provisions of § 2147 of the U. S. Rev. Stat. you are authorized to remove from that reservation all persons found therein contrary to law, and should occasion arise for you to take such action, I would suggest that you call the attention of the person or persons so removed to the provisions of § 2148 of said statute, and should he or they be found a second time within the boundaries of that reservation contrary to law, you will lay all the facts in the case before the proper United States district attorney for such action as he may deem proper in the premises. Should he decline for any reason to take action the fact should be promptly reported here."

On November 27, 1894, the department of the interior called the attention of the defendant, Captain Frank D. Baldwin, to the above communication, and directed him to give it attention, and carry out its suggestions; and orders for the removal of the plaintiff and other settlers on these lands, and which the plaintiff in his brief states are about to be enforced, and which he seeks to have enjoined, were made by the Indian agent in pursuance of these directions of the interior department.

It will thus be plainly seen what an anomalous situation might result by the assumption, at this time, by the courts, of jurisdiction over the question sought to be presented by the plaintiff. The defendant has been directed by the highest officer of the government having supervision and control over him, and by the officer empowered with the judgment and discretion, and burdened with the duty of determining, until the title to these lands has passed from the government, whether they are Indian lands or whether they are lands open to homestead settlement, to remove parties settled upon these lands because they are lands which constitute a part of an Indian reservation. The defendant has not only been so directed, but he, in his own official capacity, is so directed by the plain provision of the statutes; and we are asked to interfere by injunction with the performance of this duty so imposed upon the defendant by law, and by the judgment of his superior officer in his department. The mere suggestion of such a situation seems to us proof conclusive that congress, in the delegation of judicial powers to the secretary of the interior and also to the courts, meant, as the supreme court has held, that the exercise of that power should be exclusively confined to the officers of the interior department while the subject of it was still within its control; and after it has passed beyond such control, then, and not until then, to pass to the courts. · This construction of the law makes all harmonious. A contrary one would make interminable conflict and confusion, not preservatory, but destructive, of the rights of the government and of the citizen.

Other cases in which the supreme court of the United States has held that the courts will not interfere with the officers of the government in the exercise of the

judgment and discretion vested in them in the super-
vision of the business relating to public lands, or the
disposal thereof, either by *mandamus* or injunction, are:
*Secretary v. McGarrahan,* 9 Wall. 298; *Marquez v.
Frisbie,* 101 U. S. 473.

And this doctrine of non-interference by the courts
with the determination of any and all questions of fact
and of law involved in the disposal of the public lands,
or of the administration of the affairs of the government
pertaining thereto, prior to the time the government has
parted with the title and the land become the subject of
private ownership, is also recognized in *Johnson v. Tows-
ley,* 13 Wall. 72; *Shepley v. Cowan,* 91 U. S. 330; *Moore
v. Robbins,* 96 U. S. 530.

It is true that, in all these cases passed on by the
supreme court of the United States, the question pre-
sented was whether the action of the officers in determin-
ing the title to the lands should be controlled by *man-
damus* or injunction; while in the case at bar the posses-
sion of the land is the direct matter involved. This
difference, however, does not lessen the force of these
adjudicated cases. The principle is the same, whether
the controversy relates directly to the title to the lands,
or indirectly to a controversy over the possession. The
rightfulness of the possession in this case cannot be
determined without a determination of the controverted
question of title; and under the statutes presented, so
long as the interior department has jurisdiction of the
question of title, it has jurisdiction, as between the
plaintiff and the government, to determine who shall
possess the lands also. We think that for the courts to
take jurisdiction of the question involved, in the determ-
ination of the right to the possession of the land, would

appear little less embarrassing to the interior department, than to determine it directly in relation to the title; and if the courts should not entertain an action of injunction for the determination of the question in one form, it should not do so in the other. Whether, as between a litigant who is an applicant to make entry upon land and who claims his right to the possession of the land by virtue of his asserted right to make homestead entry thereon, and the government, it affects the question of title or possession, the question involved is equally one of cognizance by the interior department, and the principle governing the court's consideration of it is the same.

In the language which we have used with reference to the time when questions relating to the public lands may be presented to the courts, we do not mean to be understood as holding that this can be done only after the legal title has passed from the government. The title vested in the individual, and which will warrant his bringing an action in the courts to determine his rights, must be determined by the character of the relief sought, and the forum which he enters, and his action may be brought on either the legal or equitable title, as the nature of the particular case, thus guided, may determine.

In concluding this case, we do not consider it out of place to state that while the question involved in the determination of the status of these lands, as to whether it was land opened to settlement, or land set apart for the use of the Indians, was one, so far as the rights of the plaintiff now presented to us are concerned, exclusively for the determination of the officers of the interior department, before whom, at various times, and in its

various phases, the matter might be presented, and with whose determination we cannot interfere until the department has lost jurisdiction of the question, by reason of the subject-matter passing beyond its control, we consider that the determination of this question by the department was a very wise one.  It certainly would have greatly complicated matters to have permitted the plaintiff and other settlers to acquire rights in these lands while this question of the Indian title thereto remained undetermined, and would have been hazardous both to the interests of the government and the settlers.

The opposite policy from that which the department of the interior is wisely pursuing in this case was amply criticised in the opinion of Mr. Justice Shiras in the case of *Sioux City & St. P. R. Co. v. United States, supra,* in the following language:

"The fact that great injury . may be caused, not only to the complainant, but to the settlers upon these lands, and to the region in which the lands are situated, by throwing them open to settlement while the title thereto is in dispute, cannot be considered in determining the question presented by this motion.  It might not be difficult to convince anyone who has any knowledge of the lamentable evils entailed upon the community and the settlers themselves by the action of the land department in throwing open the lands upon the Des Moines river to settlement when the title was in dispute, of the unwisdom of inviting settlers to occupy lands which are claimed under specific grants from the government without first having the question of title determined by the supreme court; but the certainty of the evils resulting from such action on the part of the department cannot be urged as a reason why the court should usurp a jurisdiction not conferred upon it."

The title to these lands cannot be settled in an action of injunction between the plaintiff and these defendants.

The temporary order of injunction in this case should not have been allowed, and the judgment dissolving it was proper and is affirmed.

All the Justices concurring.